**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| SHELIA GRAY, | |
| Plaintiff, | Civil Action No.: |
| v. | |
| THE BOARD OF TRUSTEES OF THE GEORGIA MILITARY COLLEGE, | 5:21-CV-00052 |
| Defendant. | **JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiff Shelia Gray, and brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1871, 42 U.S.C. § 1983 (hereinafter, "Section 1983"), the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*,  the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended, and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* Plaintiff alleges that Defendant The Board of Trustees of The Georgia Military College subjected Plaintiff to discrimination based on race, age, and disability, including through its failure to provide a reasonable accommodation, and subjected Plaintiff to retaliation after she engaged in protected activities, and respectfully shows the Court as follows:

### JURISDICTION AND VENUE

1.

This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. §§ 1331 & 1343 and the enforcement provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5.

2.

Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff was employed, and the events underlying this action occurred, in Milledgeville, Baldwin County, Georgia, which is located within this judicial district.

## PARTIES

3.

Plaintiff Shelia Gray (hereinafter, "Plaintiff" or "Gray") is a citizen of the United States and a resident of Georgia. At all times relevant to this suit, Ms. Gray was employed with Defendant The Board of Trustees of The Georgia Military College.

4.

At all relevant times, Ms. Gray was considered a covered, non-exempt employee under Title VII of the Civil Rights Act, the Americans with Disabilities Act, and the Rehabilitation Act.

5.

Defendant The Board of Trustees of The Georgia Military College oversees Georgia Military College, as well as its preparatory school, (hereinafter, "Defendant"), a public educational entity created and recognized under the laws of the State of Georgia. *Bd. of Trustees of Ga. Military Coll. v. O'Donnell*, 835 S.E.2d 688, 692 (Ga. Ct. App. 2019) (quoting *Ga. Military College v. Santamorena*, 237 Ga. App. 58, 59 (1) (1999)); *see also* O.C.G.A. § 20-3-541.

6.

Defendant may be served with process upon a chief executive officer or clerk thereof pursuant to O.C.G.A.§ 9-11-4(e)(5). Defendant may also be served with process pursuant to the Federal Rules of Civil Procedure Rule 4(j)(2) by delivering a copy of the Summons and of the Complaint to its chief executive officer, George Hogan, the Chairman of The Board of Trustees.

7.

Defendant has employed in excess of 15 employees, working for at least 20 calendar weeks, in both 2020 and 2019, and Defendant is an agency of the State of Georgia.  As a result, Defendant is a covered employer within the meaning of Title VII of the Civil Rights Act and the Americans with Disabilities Act.

8.

Defendant is a covered employer under the Rehabilitation Act because Defendant receives federal grants of assistance and otherwise has contracts with the federal government.

**STATEMENT OF FACTS**

9.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 8, as if the same were set forth herein.

10.

Ms. Gray began her employment with Defendant in September 2015 in Defendant's Academic Records Department.   In 2018, Ms. Gray received a transfer to the position of Administrative Assistant in Defendant's Human Resources Department.  This was considered a slight promotion, and Ms. Gray received a slight increase in her compensation.

11.

At all times at issue, Ms. Gray's performance in the position of Administrative Assistant was exemplary.  Ms. Gray far exceeded the qualifications for this position, including the fact that she had obtained a Bachelor's Degree in Human Services from Mercer University.

12.

Ms. Gray has been diagnosed with heart disease, which is a chronic, serious medical condition that can cause limitations to major life activities like difficulty with strenuous activities, breathing, and a weakened immune system.  Individuals with heart disease have been identified by the Centers for Disease Control and Prevention as having a higher risk of developing serious complications if infected by the COVID-19 virus.

13.

Defendant was aware of Ms. Gray's medical condition, which in no way limited her ability to perform the essential functions of her position.

14.

During Ms. Gray's tenure, she began to notice disparities in the way in which employees of different racial backgrounds were treated in the workplace.

15.

For example, Ms. Gray noticed that Defendant gave preferential treatment to white employees when they were hired, while black employees were treated less favorably than their white colleagues when they were terminated.

16.

Defendant also hires a disproportionate number of white employees in management, and there are no black employees in senior leadership positions.

17.

Ms. Gray, who is a black female over the age of forty, experienced this disparate treatment on a number of occasions, including the time that her application for the position of Analyst in the HR Department was denied in or around April 2019.

18.

Defendant rejected Ms. Gray's application, instead promoting a younger, white male to fill the role of Analyst.  When Ms. Gray asked Defendant's Vice President of Human Resources, Jill Robins, (hereinafter, "HR VP Robins") why she did not receive an offer for this position, Ms. Gray was told that the other applicant was more qualified.

19.

Unlike the younger, white male who was promoted to the position, Ms. Gray had a college degree, had more tenure working both for Defendant and in the areas of higher education and data entry, which were both relevant to this position, and had not recently been subjected to disciplinary action by Defendant.

20.

Ms. Gray was objectively more qualified than the younger, white male who was promoted and hired for the position.

21.

After she was denied this promotion, Ms. Gray sent an email to HR VP Robins, saying that she was dissatisfied with the way that Defendant had filled this position and also asking HR VP Robins for a promotion and fair opportunities for advancement.

22.

During her tenure, Ms. Gray also observed other black employees who were denied promotions and many who ultimately resigned from their positions with Defendant as a result of the lack of advancement and other treatment.  As a result of several resignations, Ms. Gray remained the only African American in the Human Resources Department.

23.

Moreover, Defendant often gave promotions in the Human Resources Department to its younger employees. Ms. Gray was one of only three employees in the Department who was over forty years of age, and she was the only one not in a management position.

24.

In or around May 2019, Defendant provided its employees with a cost-of-living increase in their compensation. While Ms. Gray did receive this raise, the salary increase that she received was proportionally lower than her colleagues.

25.

One of Ms. Gray's job duties was to input information into Defendant's electronic database for Human Resources.

26.

Particularly because she worked in Human Resources, Ms. Gray was aware of several individuals who had filed lawsuits against Defendant or charges of discrimination with the Equal Employment Opportunity Commission based on their employment with Defendant.

27.

During her regular use of the HR database, Ms. Gray found a number of employees whose files contained a notation indicating "No Rehire."

28.

Ms. Gray knew that some of the individuals who had filed such civil or administrative actions against Defendant alleging discrimination were the same as those with the "No Rehire" notation in the HR database.

29.

Lauren Harris was one such employee who had engaged in the aforementioned protected activities who had a notation of "No Rehire" in her electronic records.

30.

In the beginning of 2020, Ms. Gray felt that she was the only person in her department who was being excluded from certain meetings.  Additionally, in March 2020, Defendant refused to allow Ms. Gray to train on new software that was being implemented within the HR department.

31.

Meanwhile, in March 2020, Respondent shut down its offices and required employees to telework because of the COVID-19 pandemic and respective orders that had been issued by State authorities.

32.

In May 2020, Defendant required that its employees return and resume working on-site. However, this was done prior to the expiration of the appropriate orders allowing Defendant to do so.

33.

As the Administrative Assistant, it was Ms. Gray's duty to interact with individuals visiting or seeking assistance from the HR Department.

34.

On the very first day that Defendant's employees returned to its offices, Ms. Gray found that practically none of Defendant's employees or visiting members of the public were following COVID-19 guidelines from the appropriate State and Federal authorities, such as wearing face coverings and observing social distancing.

35.

In the final two weeks of May 2020, Ms. Gray exchanged messages with her supervisor, Jessica Murray, explaining that she had an underlying health condition and asked that steps be taken in the HR department to protect Ms. Gray and her coworkers from coronavirus within the office.

36.

Indeed, Ms. Murray allowed Ms. Gray to temporarily move to a desk that sat slightly farther away from the window at the entrance.

37.

About one week later, Ms. Gray still felt as though Defendant was not taking the virus seriously and not taking appropriate measures.  As a result, she sent emails to her supervisors, once again explaining her heath condition and asking that accommodations be made for her.

38.

Specifically, Ms. Gray requested that a plexiglass barrier be installed at the service windows, that employees be required to wear masks in the office, that signs be installed reminding people to remain at least six feet apart, and that Defendant provided hand sanitizer for employees and customers.

39.

Having employees wear facial coverings, providing hand sanitizer, posting reminders to social distance, and installing a barrier would have offered the protections that Ms. Gray needed for her medical condition and would have allowed her to perform the essential functions of her job.

40.

Ms. Gray's email and requests were ignored by Defendant, and Ms. Gray was explicitly told that Defendant was refusing to install a plexiglass barrier and would not be requiring anyone to wear masks.

41.

Meanwhile, at the end of May 2020, numerous protests arose around the country in response to the death of George Floyd and to address police brutality and racial inequities.  On May 31, 2020, one such protest occurred at the Baldwin County Courthouse in Milledgeville.

42.

Christy Lewis was an Administrative Assistant in Defendant's business office.  In addition to having similar job titles, Ms. Lewis and Ms. Gray worked closely together at the front desk shared by the Human Resources and Resource Management departments.

43.

Ms. Lewis had a social media profile indicating that she was employed with Defendant.

44.

On or about May 31, 2020, Ms. Lewis responded to a social media post about the Milledgeville protest, making a racially offensive comment.

45.

Specifically, Ms. Lewis wrote, "[b]ring back the hoses and release the dogs!"

46.

Ms. Lewis' comments were an apparent reference to police brutality used against protesters, particularly against black protestors during the Civil Rights Movement, whereby law enforcement used fire hoses and police dogs against peaceful demonstrators.

47.

A number of Defendant's employees immediately became aware of the post and management was notified.  Ms. Gray joined a number of her current and former coworkers who spoke out about Ms. Lewis' comments, both on the social media platform and to management.

48.

Ms. Gray made it a point to let HR VP Robins know how Ms. Lewis' post offended her personally as an African American. In response, HR VP Robins simply stated that, while she found the comment offensive, it was a private post and there was nothing more that Defendant could do to address the comment.

49.

On June 1, 2020, Chief Financial Officer Jim Watkins (hereinafter, "CFO Watkins") met with members of the staff that had recently returned to the office to address a number of topics. CFO Watkins assured all of the employees that their positions were safe, despite the pandemic and economic downturn, and he announced raises for all employees that would be effective on July 1st and August 1st.

50.

During this meeting, CFO Watkins acknowledged the controversy regarding Ms. Lewis' social media post the prior day and he stated that Ms. Lewis would no longer be employed with Defendant.  CFO Watkins also directed employees to refrain from referencing their employment with Defendant on their social media profiles.

51.

CFO Watkins did not mention anything about the inappropriateness of Ms. Lewis' comments, and he did not address any issues involving race during this meeting.

52.

Ms. Gray approached CFO Watkins privately after the meeting.  When CFO Watkins asked how she was doing, Ms. Gray explained how deeply troubled she felt about Ms. Lewis' comments.

53.

Based on CFO Watkins' body language in response to Ms. Gray's comments about the social media post, Ms. Gray felt that CFO Watkins did not want to discuss this issue any further. Ms. Gray did not push the matter any further since she knew that Defendant had apparently terminated Ms. Lewis.

54.

Ms. Gray did express her concerns involving the virus, including employees' complete failure to engage in social distancing and the lack of mask wearing by her coworkers.

55.

When Ms. Gray explained that black Americans were disproportionately impacted by the virus, CFO Watkins turned red and became visibly angry.

56.

Ms. Gray also mentioned the requests she had made for her medical condition, to which CFO Watkins simply responded that the requests for plexiglass barriers had been denied by Defendant's President.

57.

Ultimately, CFO Watkins told Ms. Gray that, if she did not like how things were going or did not feel comfortable being at work due to the virus, she could either use her personal leave, take annual leave, or she could quit.

58.

Even though Defendant told the media and the local NAACP that it took personnel action against the employee who made the offensive social media post, Ms. Lewis' separation notice indicated that her position had been eliminated; it made no reference to her being terminated for her comments about fire houses and dogs.

59.

Shockingly, Defendant also offered severance pay to Ms. Lewis.

60.

Over the course of the next several weeks, Ms. Gray raised several other concerns about the pandemic, her medical condition, her relatively high risk status of infection with COVID-19, and the lack of compliance with State and Federal protocols, including CDC guidance, but her requests and concerns were still not addressed by Ms. Gray's supervisors.

61.

On at least one occasion in mid-June, Ms. Gray told her supervisor that she would not be coming in to work because of how she was feeling that day, and because of her concerns about either getting infected with coronavirus or causing her coworkers to get sick.

62.

By June 30th, Ms. Lewis' old position remained unfilled.

63.

On the morning of June 30, 2020, HR VP Robins called Ms. Gray into a meeting to let her know that she was being terminated.

64.

During this meeting, VP Robins told Ms. Gray that she had done a wonderful job during her tenure and that Ms. Gray was dedicated and excellent with customer service.

65.

HR VP Robins explained that, due to budget cuts, Ms. Gray's position was to be merged with the job previously held by Ms. Lewis.

66.

HR VP Robins told Ms. Gray that she did not know if Ms. Gray was qualified for the new position.

67.

Ms. Gray was never provided with the opportunity to apply or submit her name for consideration for this position.

68.

Indeed, Ms. Gray met the qualifications for the newly created position, particularly due to the time that she had already spent performing many of the duties of the new job.

69.

At the time of her termination, there were at least three positions available for which Ms. Gray knew that she met the qualifications of the job at Defendant's primary campus.  Particularly, those were Administrative Assistant, Learning Management Systems Support Specialist, and Academic Success Coach.

70.

At the time of Ms. Gray's termination, there were also positions available at Defendant's other campuses and locations for which Ms. Gray was qualified.

71.

Normally, when employees' jobs are impacted by budget cuts or closures, Defendant attempts to offer its employees open positions elsewhere for which they are qualified.  For example, when Defendant closed its Albany campus, Defendant offered many employees open positions at its Valdosta campus.

72.

Defendant had not filled Ms. Lewis' old position or hired someone to do the supposedly newly-consolidated job.  This is one position for which Ms. Gray was qualified.

73.

Defendant also refused to pay the sick leave that Ms. Gray had accrued at the time of her separation, as is Defendant's normal policy and practice.

74.

Despite supposed budget cuts, Defendant's HR Department actually rehired two employees shortly after Ms. Gray got terminated.

75.

On the day after Defendant fired Ms. Gray due to supposed budget cuts, most of Defendant's employees got a raise.  The remainder of Defendant's employees received an increase in compensation one month later.

76.

Indeed, Defendant offered Ms. Gray severance pay.

77.

However, the severance pay offered to Ms. Gray was approximately the same amount as that given to Ms. Lewis.

Procedural/Administrative Background

78.

On or about July 7, 2020, Ms. Gray submitted her Charge of Discrimination to the Equal Employment Opportunity Commission (hereinafter, "EEOC"), alleging that she had been subjected to discrimination based on race and age on an ongoing basis since August 2019.  The EEOC assigned Ms. Gray Charge Number 410-2020-06741.

79.

On November 10, 2020, the EEOC issued a Dismissal and Notice of Rights dated September 10, 2020.

80.

Ms. Gray has exhausted her administrative remedies as to her first Charge of Discrimination and she is filing the instant action within ninety days of the EEOC's issuance of a Dismissal and Notice of Rights.

81.

On or about December 23, 2020, Ms. Gray submitted a second Charge of Discrimination to the EEOC, alleging discrimination based on disability, including Defendant's failure to provide a reasonable accommodation, and retaliation for opposing racially offensive comments and for seeking a reasonable accommodation.  The EEOC assigned Ms. Gray's second Charge Number 410-2021-01804.

82.

Upon submission of her second Charge of Discrimination, Ms. Gray requested that a Right to Sue Letter be issued.  The EEOC acknowledged this request, but has yet to issue the Right to Sue.  Ms. Gray intends to amend this Complaint once the Right to Sue letter has been issued, and

thus, when she has exhausted her administrative remedies as to the claim contained in her Second Charge.

**COUNT I:**
**DISCRIMINATION BASED ON RACE**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**

83.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 82, as if the same were set forth herein.

84.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment because of such person's race.  42 U.S.C. § 2000e-2(a).

85.

Plaintiff is considered in a protected class as her race is black or African American.

86.

As alleged herein, Plaintiff was qualified for the position that she held with Defendant and her performance was exemplary at all times.

87.

As alleged herein, Plaintiff was also qualified for advancement and promotions to positions that came open during her tenure, but Defendant refused to consider Plaintiff's application.

88.

As alleged herein, Plaintiff was qualified and applied for the position of Analyst.

89.

Defendant rejected Plaintiff's application for the position of Analyst.

90.

Defendant selected an employee who did not identify as black or African American, even though the other applicant was less qualified than Plaintiff.

91.

As alleged herein, Plaintiff was qualified for the newly-created position that Defendant stated was, in part, created from Plaintiff's role.

92.

Defendant refused to consider Plaintiff for this position, instead holding the position open while it continued to look for candidates to fill the position.

93.

As alleged herein, Plaintiff was treated less favorably than her coworkers, who were not black or African American, in that the pay raises that she received were disproportionately lower, she was not provided with opportunities for training, and she was excluded from internal meetings.

94.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for failing to consider Plaintiff for the aforementioned positions and otherwise treating Plaintiff less favorably than her counterparts who are not black or African American.

95.

Plaintiff will prove that the Defendant's stated reasons are pretextual and were indeed motivated by Plaintiff's race.

96.

Plaintiff has been injured by Defendant's discrimination based on race against her, and she is entitled to all damages allowed under Title VII of the Civil Rights Act, including back pay

including fringe benefits, front pay, injunctive relief, compensatory and punitive damages in the amount of $300,000.00, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

## COUNT II:
### RACIAL DISCRIMINATION
### IN VIOLATION OF SECTION 1983

97.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 82, as if the same were set forth herein.

98.

Pursuant to the Fourteenth Amendment of the Constitution of the United States, Plaintiff has the right to equal protection and due process of law.

99.

Plaintiff has a right to be free from discrimination based on race from Defendant, as a person acting under color of the laws of the State of Georgia. 42 U.S.C. § 1983.

100.

As a black or African American woman, Plaintiff has the same right to make and enforce contracts as her white counterparts, which cannot otherwise be impaired by nongovernmental discrimination or impairment under color of State law. 42 U.S.C. § 1981.

101.

For the reasons set forth in Count 1, *supra*, which are incorporated herein, Defendant is liable to Plaintiff for infringing upon her rights under the Fourteenth Amendment of the Constitution of the United States and 42 U.S.C. §§ 1981, 1983 and Plaintiff is entitled to all damages available to her in amount to be proven at trial.

**COUNT III:**
**AGE DISCRIMINATION**
**IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

102.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 82, as if the same were set forth herein.

103.

Pursuant to the Age Discrimination in Employment Act, it is unlawful for an employer to discriminate against any individual with respect to the compensation, terms, conditions, or privileges of his or her employment because of such individual's age. 29 U.S.C. § 623.

104.

Plaintiff is between the ages of forty and seventy.

105.

As alleged herein, Plaintiff was qualified and applied for the position of Analyst.

106.

Defendant rejected Plaintiff's application for the position of Analyst.

107.

Defendant selected an employee who was substantially younger than Plaintiff, even though the other applicant was less qualified than Plaintiff.

108.

As alleged herein, Plaintiff was treated less favorably than her coworkers, who were younger than her, in that the pay raises that she received were disproportionately lower, she was not provided with opportunities for training, and she was excluded from internal meetings.

109.

Defendant will be unable to present any evidence of a legitimate nondiscriminatory motive for failing to consider Plaintiff for the aforementioned positions and otherwise treating Plaintiff less favorably than her counterparts who were younger than Plaintiff.

110.

Plaintiff will prove that the Defendant's stated reasons are pretextual, were willful and indeed motivated by Plaintiff's age.

111.

Plaintiff has been injured by Defendant's discrimination based on age, and she is entitled to all damages allowed under the Age Discrimination in Employment Act, including back pay including fringe benefits, front pay or reinstatement, injunctive relief, liquidated damages, and attorney's fees and costs of litigation, all in an amount to be proven at trial.

**COUNT IV:**
**DISCRIMINATION BASED ON DISABILITY**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

*[Reserved]*

**COUNT V:**
**DISCRIMINATION BASED ON DISABILITY**
**IN VIOLATION OF THE REHABILITATION ACT**

*[Reserved]*

**COUNT VI:**
**FAILURE TO PROVIDE A REASONABLE ACCOMMODATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

*[Reserved]*

## COUNT VII:
## FAILURE TO PROVIDE A REASONABLE ACCOMMODATION
## IN VIOLATION OF THE REHABILITATION ACT

*[Reserved]*

## COUNT VIII:
## RETALIATION
## IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT

### 112.

Plaintiff hereby pleads and incorporates by reference all of the allegations contained in Paragraphs 1 through 82, as if the same were set forth herein.

### 113.

Under Title VII of the Civil Rights Act, it is unlawful for an employer to retaliate against an employee because she has opposed any unlawful employment practice.  *See* 42 U.S.C. § 2000e-3(a).

### 114.

As alleged herein, Plaintiff observed one of Defendant's other employees make comments pertaining to race that Plaintiff and others found deeply offensive.

### 115.

After observing her colleague make the racially discriminatory comment, Plaintiff complained about the comment to several members of management, urging Defendant to address the conduct.

### 116.

Because of Plaintiff's reports about the racially discriminatory comments to management, Defendant terminated Plaintiff's employment.

117.

Plaintiff has been injured by Defendant's retaliatory conduct in response to Plaintiff's participation in protected activities, and Plaintiff is entitled to all damages allowed under the Title VII of the Civil Rights Act, including compensatory damages, reinstatement, backpay, injunctive relief, punitive damages, and reasonable attorney's fees and costs of litigation, in an amount to be proven at trial.

**COUNT IX:**
**RETALIATION**
**IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

*[Reserved]*

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Shelia Gray respectfully prays for the following relief:

1)      That Summons and Process be issued to Defendant The Board of Trustees of Georgia Military College, and that said Defendant be served as provided by law;

2)      That this matter be tried before a jury;

3)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count I for discrimination based on race, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

4)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count II for discrimination based on race, and grant Plaintiff all relief allowable Section 1983;

5)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count III for discrimination based on age, and grant Plaintiff all relief allowable under the Age Discrimination in Employment Act;

6)      That judgment be awarded for and in favor of Plaintiff and against Defendant on Count VIII for retaliation, and grant Plaintiff all relief allowable under Title VII of the Civil Rights Act;

7)      That the Court grant Plaintiff leave to amend her Complaint at the time in which Plaintiff has exhausted her administrative remedies on her remaining claims;

8)      For such other relief as this Court shall deem just and proper.

Respectfully submitted, this 8th day of February, 2021.

KENNETH E. BARTON III
Georgia Bar No. 301171
M. DEVLIN COOPER
Georgia Bar No. 142447
*Attorneys for Plaintiff*

COOPER, BARTON & COOPER, LLP
170 College Street
Macon, Georgia 31201
(478) 841-9007 telephone
(478) 841-9002 facsimile
keb@cooperbarton.com
mdc@cooperbarton.com