**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **SHELIA GRAY,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:21-cv-52 (MTT)** |
| | ) | |
| **THE BOARD OF TRUSTEES OF THE** | ) | |
| **GEORGIA MILITARY COLLEGE,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Plaintiff Shelia Gray worked at Georgia Military College ("GMC") as an
Administrative Assistant in GMC's Human Resources Department.  Doc. 8.  After GMC
laid her off as part of a reduction in force ("RIF"), Gray filed a complaint alleging
numerous claims.  *Id.*  Only three remain pending—Gray's Title VII discrimination,
Rehabilitation Act discrimination, and Rehabilitation Act retaliation claims.  Docs. 8; 34.
Defendant the Board of Trustees of the GMC now moves for summary judgment.  Doc.
59.  For the reasons discussed below, the Board's motion (Doc. 59) is **GRANTED**.

### I. BACKGROUND

Gray, an African American woman, began her employment with GMC in
September 2015 as a "Transcript Processor."  Docs. 59-1 ¶ 1; 70-1 ¶ 1.  On May 1,
2018, Gray was promoted to "Administrative Assistant" in GMC's Human Resources
Department and held that position until she was laid off on June 30, 2020.  Docs. 59-1
¶¶ 1, 30; 70-1 ¶¶ 1, 30.  Gray's primary job responsibilities included answering the

phone, greeting visitors, scanning personnel records, processing purchase orders, and completing employment verification forms.  Docs. 59-1 ¶ 2; 70-1 ¶ 2.

When Gray was promoted to the Administrative Assistant position, Jill Robbins headed the Department and Jessica Murray, the Department's Assistant Manager, was Gray's immediate supervisor.  Docs. 59-1 ¶ 2; 70-1 ¶ 2.  The other employees in Human Resources when Gray joined the Department were Tammy Pennington (Director of Benefits), Natasha Tremble (Human Resources Information Systems Analyst), Will Bache (Recruiting and Onboarding Coordinator), Megan Glover (Audit and Compliance Manager), and Megan Brooks (Federal Work Study Coordinator).  Docs. 59-1 ¶ 3; 70-1 ¶ 3.  Tremble resigned from her position on January 31, 2019, and Bache was promoted to Human Resources Information Systems ("HRIS") Analyst.  Docs.  59-1 ¶ 5; 70-1 ¶ 5.  The Department was then restructured.  Docs.  59-1 ¶ 6; 70-1 ¶ 6.  Murray, the Assistant Manager, assumed some of Robbins's duties; Bache's onboarding responsibilities were transferred to Glover, the Audit and Compliance Manager; the Federal Work Study Coordinator position became part-time; and a new Recruiting Coordinator position was created.  Docs. 59-1 ¶ 6; 70-1 ¶ 6.  As for Gray, she assumed the responsibility of "assisting with password resets."  Docs. 59-1 ¶ 6; 70-1 ¶ 6.  Murray, Brooks, Glover, and Gray all received pay raises, although Gray questions whether the raises were proportional to the responsibilities assumed by each employee because of the restructuring.  Docs. 59-1 ¶ 7; 70-1 ¶ 7.

To increase efficiency, the Department, in early 2020, began implementing PAYCOM, "a full-service human capital management system that offers access to payroll and HR services in a single software."  Docs. 59-1 ¶ 8; 70-1 ¶ 8.  Part of

PAYCOM's rollout included training for Human Resources personnel on how to operate the PAYCOM functions that directly related to their job duties.  Docs. 59-1 ¶ 9; 70-1 ¶ 9.  Because Gray's duties as an Administrative Assistant were primarily secretarial, she was not initially required to participate in PAYCOM training.  Docs. 59-1 ¶ 9; 70-1 ¶ 9.  Thus, when Department personnel began training all GMC employees on PAYCOM, Gray was directed to "remain in the office to answer phones and greet visitors."  Docs. 59-1 ¶ 10; 70-1 ¶ 10.  The Board contends Gray was offered training on all aspects of PAYCOM that were necessary to perform her job—mainly concerning the timekeeping and attendance functions that all GMC employees needed to be familiar with—whereas Gray claims she "was not given any specific reason to believe that she needed to attend" PAYCOM training.  Docs. 59-1 ¶ 11; 70-1 ¶ 11.

On March 31, 2020, GMC shifted to remote work because of the coronavirus pandemic.  Docs. 59-1 ¶ 12; 70-1 ¶ 12.  In preparation for that shift, Gray's supervisor, Murray, asked Gray on March 23, 2020, whether she could perform employment verifications from home with her personal computer; Gray responded that she could.  Docs. 59-1 ¶ 13; 70-1 ¶ 13.  With remote work underway on April 9, 2020, Robbins emailed to confirm Gray could work from home, and Gray responded that although she was "not set up completely," she would work with IT that day "to have complete access."  Docs. 59-1 ¶ 14; 70-1 ¶ 14.  This exchange resulted in GMC issuing Gray a laptop— Gray disputes whether she was required to use that laptop to perform her work.  Docs. 59-1 ¶¶ 14-16; 70-1 ¶¶ 14-16.

In May 2020, GMC began preparations for returning to campus.  Docs. 59-1 ¶ 17; 70-1 ¶ 17.  On May 21, 2020, Gray asked Murray what measures GMC was taking to

mitigate the spread of the virus.  Docs. 59-1 ¶ 17; 70-1 ¶ 17.  Murray responded that

employees would be provided with masks and hand sanitizer, and when prompted for

additional suggestions, Gray requested floor markings to enforce social distancing and

a plexiglass barrier in front of her desk.  Docs. 59-1 ¶ 17; 70-1 ¶ 17.  Gray also

requested placement of signs in front of her desk and that of Christy Lewis, the

Administrative Assistant for the Business Office who sat near Gray.[1]  Docs. 59-1 ¶ 17;

70-1 ¶ 17.  The next day, Murray and Robbins emailed Gray that GMC would place floor

markings and post signs but would not install plexiglass barriers.  Docs. 59-1 ¶ 18; 70-1

¶ 18.  Gray insisted that the plexiglass barrier be installed due to "underlying health

conditions," but she never told Murray, Robbins, or anyone else what those conditions

were.  Docs. 59-1 ¶¶ 18-19; 70-1 ¶¶ 18-19.  Specifically, Gray admits that while Murray

was aware Gray suffered from an unspecified back condition, "with respect to the

'underlying health condition' at issue in this litigation, it is undisputed that Ms. Gray did

not tell the supervisors at issue about her underlying health conditions."  Docs. 59-1 ¶

19; 70-1 ¶ 19.  All GMC employees returned to the office on June 1, 2020.  Docs. 59-1 ¶

20; 70-1 ¶ 20.

Before the pandemic, GMC faced financial challenges which the pandemic

exacerbated.  Docs. 59-1 ¶ 24; 70-1 ¶ 24.  Consequently, GMC implemented a hiring

freeze on April 1, 2020, but when that proved inadequate, department heads were told a

RIF was necessary.  Docs. 59-1 ¶¶ 24-25, 29; 62 at 124:17-25; 70-1 ¶¶ 24-25, 29.

Robbins, who sought to "lead the way on the restructure," identified the Administrative

---

[1] Lewis resigned on June 1, 2020, because she had posted a racially inflammatory comment on her personal social media account, and thus never returned to the office.  Docs. 59-1 ¶ 23; 70-1 ¶ 23.  When Gray and others returned, GMC leadership convened a meeting to address Lewis's social media posts and the public controversy that surrounded them.  Docs. 59-1 ¶ 20; 62 at 142:2-11; 70-1 ¶ 20.

Assistant position held by Gray for elimination "because its job responsibilities were the easiest for the Department to absorb"—Murray, Bache, Brooks and Glover all previously held that role within human resources.  Docs. 59-1 ¶ 26; 62 at 124:23-25; 70-1 ¶ 26. GMC eliminated nine other positions as part of the RIF, all of which were held by white employees.  Docs. 59-1 ¶ 27; 70-1 ¶ 27.

Robbins informed Gray that her position was eliminated as part of GMC's RIF on June 30, 2020, and Gray was terminated that same day.  Docs. 59-1 ¶ 30; 70-1 ¶ 30. After her termination, Gray claims she submitted applications for the positions of "Academic Success Coach" and "Admissions Assistant," both of which were posted on GMC's website.  Docs. 59-1 ¶¶ 31-32; 70-1 ¶¶ 29, 31-32.  There is no record GMC received any applications from "Sheila Gray."  Docs. 59-1 ¶¶ 31-32; 70-1 ¶¶ 31-32. Rather, GMC received applications from "Shelia Reynolds" and "Shelia Ledford."  Docs. 59-1 ¶¶ 31-32; 70-1 ¶¶ 31-32.  Those applications, however, were incomplete.  Docs. 59-1 ¶¶ 31, 33; 70-1 ¶¶ 31, 33.  In any event, GMC elected not to fill the Academic Success Coach position at that time and did not reopen the position until the following year.  Docs. 59-1 ¶ 33; 70-1 ¶ 33.  GMC hired an African American to fill the Admissions Assistant position on September 1, 2020.  Docs. 59-1 ¶ 35; 70-1 ¶ 35.

On January 26, 2022, some eighteen months after the RIF, GMC eliminated the HRIS analyst job held by Bache because "PAYCOM had rendered his position obsolete," and Bache was transferred to an available position in the engineering department.  Docs. 59-1 ¶ 41; 70-1 ¶ 41.

Gray's complaint raised ten claims under Title VII, 42 U.S.C. § 1983, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"),

and the Rehabilitation Act.  Doc. 8.  The Board moved for partial judgment on the pleadings on Eleventh Amendment immunity, exhaustion, and failure to state a claim grounds.  Doc. 10.  Following oral argument, the Court converted the Board's Rule 12(c) motion to a motion for summary judgment and granted the parties sixty days to conduct limited discovery on the issues of Eleventh Amendment immunity and exhaustion.  Doc. 23.  Because the Board is an "arm of the state," the Court granted the Board's motion as to Gray's ADEA, ADA, and 42 U.S.C. § 1983 claims.  Doc. 34 at 8-15.  With respect to Gray's Title VII retaliation claim and other Title VII claims not within the scope of her first EEOC charge of discrimination, the Court granted the Board's motion on exhaustion grounds.[2]  *Id.* at 15-20.  Finally, the Court dismissed portions of Gray's Title VII claims that failed to state a claim.  *Id.* at 20-22.

---

[2] The preferred method of attack of Gray's attorney, who has considerable experience, is to launch a broadside of claims that require considerable pretrial skirmishing, often on the issue of exhaustion.  The Court has had what might be called philosophical discussions with Gray's attorney about, from a plaintiff's perspective, the wisdom of this approach.  *See, e.g.*, *Scott v. Macon-Bibb Cnty., Ga.*, 2023 WL 2411016, at *4 (M.D. Ga. Mar. 8, 2023).  The sharp thrust of the main claim or claims arguably is the most effective and economical means of securing an objective.  To take the martial theme one step further, the fog of war created by a broadside attack can lead to confusion and mistakes.  That may have happened here.

One reason exhaustion has been problematic for Gray's attorney is that a client's EEOC charge typically focuses on the *actual* issue—"I got fired because of my race"—rather than claims creatively constructed long after the fact.  Here, Gray's Title VII retaliation claim has been particularly problematic from the outset—her "first EEOC charge fail[ed] to check the box for 'retaliation,' d[id] not mention retaliation, and d[id] not allege she engaged in protected activity."  Doc. 34 at 19 (citing Doc. 10-1).  To avoid that problem, Gray's attorney argued that Gray's *second* EEOC charge exhausted her Title VII retaliation claim, an argument he had to withdraw because "Gray's second charge only alleged discrimination under the ADA."  *Id.* (citing Doc. 26-1 ¶¶ 27-28).  After the Court allowed Gray an additional sixty days to conduct discovery and submit evidence of exhaustion, Gray's counsel filed a supplemental brief which failed to even address the exhaustion of her Title VII retaliation claim.  Doc. 26.  In short, discovery closed and there was no evidence that Gray had exhausted her Title VII retaliation claim.

Then Gray's attorney, some three weeks later, and "for the first time, tendered a copy of what he alleged to be Gray's Response to the Board's position statement ('Position Paper Response' or 'Response') before the EEOC and asked the Court to supplement the record with that Response."  Docs. 30 at 13; 30-2.  To explain his failure to timely produce the Position Paper Response, Gray's counsel apparently "forgot that he forgot [it] was not in the EEOC file."  Doc. 33. at 7.  In other words, he blamed it on the EEOC.  The Court convened a hearing, which Gray herself attended, to determine just when the Position Paper Response surfaced.  Doc. 48.  It turned out Gray and her counsel had it all along.  *Id.* at 11:21-12:24.  Because "Gray ha[d] provided no credible or good faith basis for excusing her failure to timely

Accordingly, only Gray's May 2019 unequal pay raise claim, failure-to-train claims, and June 2020 termination claim survived the Board's motion.  *Id*. at 2; Doc. 23. The Board now moves for summary judgment on those Title VII claims, and Gray's Rehabilitation Act discrimination and Rehabilitation Act retaliation claims that the Board did not move to dismiss.[3]  Doc. 59.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of

---

provide her Position Paper Response," the Court denied Gray's motion to supplement the record with that Response (Doc. 33); dismissed her Title VII retaliation claim, and others, on exhaustion grounds (Doc. 34); and denied Gray's motions for reconsideration of both orders (Doc. 49).

Gray filed a third motion for reconsideration (Doc. 38) of the Court's dismissal of her Title VII retaliation claim.  Based on "newly discovered evidence," she argued her initial inquiry to the EEOC, showed that her Title VII retaliation claim was exhausted.  Doc. 38.  The Board argued, reasonably, that Gray's motion for reconsideration was a thinly veiled attempt to circumvent the Court's order denying Gray's request to belatedly supplement the record with her Position Paper Response.  Doc. 41 at 3.  Nonetheless, the Court denied Gray's motion for reconsideration *without* prejudice on April 11, 2022, "with leave to refile that motion once a record has been established to support the contention that the Court can consider Gray's initial inquiry to the EEOC as newly discovered evidence."  Doc. 43 at 2.  Gray renewed that motion on January 19, 2023, but concedes "that nothing that occurred or that was exchanged in discovery had any material impact on the contentions that Plaintiff initially made in her Motion."  Doc. 65 ¶ 2.  Thus, Gray has not shown, and has made no effort to show, that she was diligent in her efforts to obtain any of her "newly discovered evidence."  There is only so much the Court can do.  Accordingly, Gray's renewed motion for reconsideration based on "newly discovered evidence" (Doc. 65) is **DENIED**.

[3] The Board also moves for summary judgment on Gray's claim that she was given an ultimatum to either use a GMC-issued laptop or face furlough.  Doc. 59-2 at 9-11.  That claim, to the extent it can be called a claim, was not previously addressed in the Board's motion for judgment on the pleadings.  Doc. 10.

materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *non-moving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc*., 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge …. The

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

Gray's response to the Board's motion for summary judgment largely, and improperly, relies on Gray's amended complaint rather than the developed record.  Doc. 70 at 1-4.  Even then, Gray gives scant attention to her Title VII claims, most of which she appears to abandon, and devotes six pages to her Rehabilitation Act discrimination and Rehabilitation Act retaliation claims—which fail because, in Gray's counsel's own words, "it is undisputed that Ms. Gray did not tell the supervisors at issue about her underlying health conditions."  Docs. 59-1 ¶ 19; 70-1 ¶ 19.  To the extent Gray's counsel improperly embeds additional arguments in his response to the Board's statement of facts, none of which are persuasive, those arguments will not be addressed by the Court.  *See*, *e.g.*, *Hall-Gordon v. Bibb Cnty. Sch. Dist.*, 2022 WL 3704917, at *2 (M.D. Ga. Aug. 27, 2022).

**A. Gray's Title VII Claims Fail**

Title VII makes it unlawful "for an employer … to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color."  42 U.S.C. § 2000e-2(a)(1).  It is undisputed that no direct evidence of discrimination exists here, so the Court analyzes Gray's Title VII claims under the *McDonnell Douglas* burden-shifting framework.  Docs. 59-2 at 4-5, 14-15; 70 at 5-7; *Lewis v. City of Union City*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (discussing *McDonnell Douglas Corp. v. Green*.  411 U.S. 792 (1973)).

Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination, the test for which differs slightly depending on the nature of the claim. *McDonnell Douglas*, 411 U.S. at 802. If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981). This burden of production means the employer "need not persuade the court that it was *actually* motivated by the proffered reasons," but must produce evidence sufficient to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

A plaintiff can then show that the employer's stated reason is in fact pretext for discrimination. *Id.* at 1308. This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. (quoting *Burdine*, 450 U.S. at 256). "If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment." *Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). Where "a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer." *Kragor*, 702 F.3d at 1309.

The Board argues Gray cannot "establish her prima facie case with regards to any of her [Title VII] claims." Doc. 59-2 at 3. Even if she could, the Board argues that it

"has articulated a legitimate reason for each alleged instance of unlawful conduct, and [Gray] cannot demonstrate that any of [the Board's] proffered reasons are pretextual." *Id*. Gray's two-page response does not address her failure-to-train, unequal pay raise, and laptop "ultimatum" claims—she only argues that the Board is "clearly not entitled to summary judgment on Ms. Gray's racial discrimination claim concerning her termination and failure to rehire." Doc. 70 at 5-7. Accordingly, Gray's failure to train, unequal pay raise, and "ultimatum" claims are abandoned.[4] *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). What's left then, is Gray's claim that she was terminated as part of GMC's RIF, and not considered for another position, because of race.

---

[4] Even if addressed on the merits, Gray's failure-to-train, unequal pay raise, and "ultimatum" claims fail. Gray makes no effort to identify a similarly situated comparator for her failure-to-train claim. Even if she did, the Board has provided a legitimate, non-discriminatory reason for the alleged failure to train—"specifically, that, whenever Plaintiff was not invited to a PAYCOM training, it was because the training did not concern her particular job functions." Doc. 59-2 at 8 (citing Docs. 59-1 ¶¶ 9, 11; 70-1 ¶¶ 9, 11). Again, Gray's unequal pay raise claim also fails because she cannot point to a comparator—Murray, Brooks, Glover, and Gray each assumed different job responsibilities as a result of the Human Resources Department restructure. Docs. 59-1 ¶ 6; 70-1 ¶ 6. In any event, the Board contends Gray was paid less because she merely assumed the responsibility of "assisting with password resets," whereas Murray, Brooks, and Glover "were given higher raises because they took on greater added job responsibilities." Doc. 59-2 at 9 (citing Doc. 59-1 ¶¶ 5-6). While Gray disputes whether the raises were proportional to the responsibilities assumed by each employee because of the restructuring, Gray cannot establish that this reasoning was pretextual, as the Board notes. Docs. 59-1 ¶ 7; 70-1 ¶ 7; 59-2 at 9. Finally, the exchange between Robbins and Gray which forms the basis of her "ultimatum" claim does not constitute an adverse action—Robbins simply asked Gray to confirm she was able to work from home, and Gray responded that although she was "not set up completely," she would work with IT that day "to have complete access." Docs. 59-1 ¶ 14; 70-1 ¶ 14. If that exchange could be construed to mean that Gray was directed to use a GMC-issued laptop to work from home as Gray suggests in her response to the Board's statement of material facts, Gray cannot show that using the laptop was any different than using GMC's desktop computers at work and thus Gray cannot establish the adverse action element of her claim. *See* Docs. 59-1 ¶¶ 14-16; 70-1 ¶¶ 14-16. Nor can Gray rebut the Board's legitimate, nondiscriminatory reason for that direction—"[b]ecause GMC employees were not coming to the workplace, Ms. Robbins needed to ensure that all of the HR employees, including Plaintiff, could accomplish their work from home." Doc. 59-2 at 10-11.

*1. Gray has Not Established a Prima Facie Case of Discrimination*

Gray's failure to identify a comparator is not fatal—"in cases where a position was eliminated as part of a reduction in force, a modified prima facie formulation may apply."[5] *Vega v. Invesco Grp., Ltd.*, 432 F. App'x 867, 870 (11th Cir. 2011) (citing *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1344 (11th Cir. 2003)).   Under the RIF-specific formulation, a plaintiff "may establish a prima facie case by showing (1) she is a member of a protected class; (2) she was terminated; (3) she was qualified to assume another position at the time of her termination; and (4) there is evidence from which a reasonable factfinder could conclude the employer intended to discriminate against her in reaching the employment decision at issue."[6] *Crisman v. Fla. Atl. Univ. Bd. of Trustees*, 659 F. App'x 572, 578 (11th Cir. 2016) (citing *Jameson v. Arrow Co.*, 75 F.3d 1528, 1531-32 (11th Cir. 1996); *Coutu v. Martin Cnty. Bd. of Comm'rs.*, 47 F.3d 1068, 1073 (11th Cir. 1995)).

---

[5] Typically, a Title VII plaintiff must show "(1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees who are not members of the plaintiff's class more favorably; and (4) she was qualified for the job ... at issue" to establish a prima facie case of race discrimination.  *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000).  For some reason, Gray argues this is the applicable standard, but she identifies no comparators.  Doc. 70 at 5-7.  Giving Gray the benefit of the doubt, the Court addresses Gray's claims using the modified RIF standard.

[6] It could also be said that the modified RIF prima facie case formulation, particularly its fourth element, is just another way of presenting a "convincing mosaic" argument.  The Eleventh Circuit has stated that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Instead, a plaintiff can survive summary judgment by presenting "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  *Id.*  "A triable issue of fact exists if the record, viewed in a light more favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Smith*, 644 F.3d at 1328).  A plaintiff establishes a convincing mosaic by showing evidence regarding, among other things, "(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systemically better treatment of similarly situated employees, and (3) pretext."  *Id.* at 1250.  Gray does not argue her claims survive under the convincing mosaic framework.  However, even if she had, the Court concludes that the record is deplete of any evidence to meet the convincing mosaic standard.

The parties mainly focus on whether Gray was qualified to assume another position after her termination, specifically "Academic Success Coach" and "Admissions Assistant."  Docs. 59-2 at 12-13; 70 at 6.  "When an employer reduces its work force for economic reasons, it is not required to transfer or rehire laid-off employees in a protected class as a matter of course or to fire employees outside of the protected class to create positions for employees within the protected class."  *Crisman*, 659 F. App'x at 578 (citing *Jameson*, 75 F.3d at 1532-33).  "Where a discharged employee applies for another position available at the time of her termination for which she is qualified, however, the employer must consider her for that position and may not deny her the position on the basis of her membership in a protected class."  *Id.* (citing *Jameson*, 75 F.3d at 1533).  But "[i]f an employee fails to apply for a particular position, she cannot establish a prima facie case of discrimination, unless the employer lacked a formal system for providing notice of job opportunities, and the employee had no way of knowing the position was available."  *Id.* (citing *Smith*, 352 F.3d at 1345-46).  Put simply, once Gray's position was eliminated as part of the RIF, GMC was not required to transfer Gray merely because she was Black, but GMC was required to consider Gray, without regard to her race, for available positions for which she applied and was qualified.

Gray does not dispute that GMC had a formal system for advertising open positions—she attaches a screenshot of GMC's career portal in her response to the Board's statement of facts.  Doc. 70-1 ¶ 29.  Neither, at least initially, did Gray maintain that she had applied in her name for the positions of Academic Success Coach and Admissions Assistant.  Docs. 59-1 ¶ 31; 61 at 139:17-140:10; 70-1 ¶ 31.  But now,

through an affidavit attached to her summary judgment response, she argues she

applied for both positions on June 30, 2020, using her own name, as opposed to the

aliases "Shelia Reynolds" and "Shelia Ledford."  Doc. 70-3 at 1-3.  That last-minute

assertion is peculiar given Gray's deposition testimony on August 17, 2022, that she did

"not recall the exact positions," she applied for, or whether she received an email

confirmation, or whether an email confirmation would theoretically exist had she applied.

Doc. 60 at 139:17-140:10.  The Board's counsel does not press the issue.[7]

So, it seems that Gray suddenly remembered the positions she applied for and

located the email confirmations.  Doc. 70-3 at 4-5, 8-9.  Those emails, both automated

receipts from GMC's application portal, show that a person using the email

slgray1112@gmail.com submitted their "resume/cv" for the position of Admissions

Assistant at 5:32 p.m. on June 30, 2020, and Academic Success Coach on June 30,

2020, at 5:53 p.m.  *Id.*  Notably, June 30, 2020, was the day of Gray's termination.

Docs. 59-1 ¶ 30; 70-1 ¶ 30.

GMC, however, has no record of applications submitted on June 30, 2020, from

Gray, only four incomplete applications from "Shelia Reynolds" and "Shelia Ledford"

which were submitted on July 8, 2020, and July 14, 2020, by a person using the email

slgray1112@gmail.com—the same email Gray testified she used to submit applications

under her name on June 30, 2020.  Docs. 63 at 64:12-14; 70-3 at 15.  An additional

email provided by Gray shows that at least with respect to the Admissions Assistant

position, GMC did receive an application from a person using the email

---

[7] It could be argued that Gray's affidavit should be disregarded by the Court as a sham.  *Israel v. John Crane, Inc.*, 601 F. Supp. 3d 1259, 1269 (M.D. Fla. 2022) ("The sham affidavit rule precludes a party from manufacturing a genuine dispute of material fact by contradicting prior deposition testimony with an affidavit.") (citing *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240 n.7 (11th Cir. 2003)).

slgray1112@gmail.com, although it is unclear whether that email was in response to Gray's June 30, 2020, application, or the applications submitted by "Reynolds" and "Ledford." Doc. 70-3 at 6-7. That email, sent by GMC's enrollment manager on July 27, 2020, asked the recipient to confirm they were still interested in the Admissions Assistant position, and if so, to answer three behavioral questions regarding previous work experience. *Id.* at 6. But the record does not contain Gray's response to that email, which apparently was required to fully complete the application. *See id.*

In short, just what Gray was doing if and when she submitted job applications, and in whose name they were submitted, is a muddle. But it is a muddle that makes no difference. For even if Gray had submitted complete applications for the Academic Success Coach and Admissions Assistant positions, she has not presented any evidence of, or addressed in any way, the fourth element of her prima facia case—that GMC intended to discriminate against her. *Crisman*, 659 F. App'x at 578. To establish intent, Gray must proffer evidence that would allow a reasonable jury to conclude GMC "consciously refused to consider retaining" her because of her race or regarded race as a "negative factor in the retention consideration." *Padilla v. N. Broward Hosp. Dist.*, 270 F. App'x 966, 971 (11th Cir. 2008) (quoting *Allison v. Western Union Tel. Co.*, 680 F.2d 1318, 1321 (11th Cir. 1982)). Gray makes no attempt to carry this burden, she simply ignores it. Perhaps for good reason. The Admissions Assistant position was filled by an African American on September 1, 2020, and the Academic Success Coach position was not filled at the time and was not reopened until the following year. Docs. 59-1 ¶¶ 33, 35; 70-1 ¶¶ 33, 35. There is simply no evidence, circumstantial or otherwise, that either of those decisions was motivated by discriminatory intent.

*2. The Board's Legitimate, Nondiscriminatory Reasons*

Because Gray has failed to establish a prima facie case of discrimination for the Title VII claims that she did not abandon, the Court's analysis could end here. Nonetheless, the Court will briefly address the Board's stated reason for Gray's termination and the Board's subsequent decision not to give Gray the Academic Success Coach position.

It is undisputed that the RIF was a consequence of financial stress.  Docs. 59-1 ¶¶ 24-25, 29; 62 at 124:17-25; 70-1 ¶¶ 24-25, 29.  Gray was included in the RIF, according to her supervisor, "because [Gray's] job responsibilities were the easiest for the Department to absorb"—Murray, Bache, Brooks, and Glover all previously held Gray's role within Human Resources.  Docs. 59-1 ¶ 26; 62 at 124:23-25; 70-1 ¶ 26. Simply put, the Board contends GMC needed to cut costs and Gray was the low-hanging fruit.  That may be harsh but that's the way RIFs work.  As for the Academic Success Coach position, and assuming Gray applied for the position, GMC elected not to fill the position and did not reopen the position until the following year.  Docs. 59-1 ¶ 33; 70-1 ¶ 33.

*3. Gray Cannot Show Pretext*

Gray cannot rebut the Board's proffered reasons for their employment actions. Federal courts "are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, [the] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).  To show that unlawful discriminatory animus motivated an employer's decision, "the evidence produced must reveal such

weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1313 (11th Cir. 2016) (internal quotation marks omitted).  "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  In short, Gray must show "*both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Gray makes little effort to show pretext—she merely states the Board's stated reasons "do not appear to be legitimate."  Doc. 70 at 7.  That's not how it works.  Perhaps Gray could pierce the Board's proffered economic justification if the RIF disproportionately affected black employees, but it didn't—nine of the ten positions eliminated were held by white employees.[8]  Docs. 59-1 ¶ 27; 70-1 ¶ 27.  Gray points to Bache, who was transferred to the engineering department on January 26, 2022, after his job was eliminated because "PAYCOM had rendered his position obsolete."  Docs. 59-1 ¶ 41; 70-1 ¶ 41.  But Bache's position was eliminated because of obsolescence rather than financial stress.  Docs. 59-1 ¶ 41; 70-1 ¶ 41.  The fact that he was transferred to an available position over eighteen months after the RIF casts no doubt on the decisions made during the RIF.  *See* Docs. 59-1 ¶ 41; 70-1 ¶ 41.  Finally, for

---

[8] Gray also points to GMC's treatment of Lewis, the Administrative Assistant for the Business Office who resigned before the RIF was announced, but she does not explain how Lewis's resignation is relevant, and, in any event, Lewis's position was never filled because it was also eliminated as part of the RIF. Docs. 59-1 ¶ 27; 70-1 ¶ 27.

GMC's failure to hire Gray for the Academic Success Coach position, Gray merely quibbles with GMC's decision not to consider *any* of the applicants for that role.

In summary, Gray fails to make out a prima facie case of discrimination for her Title VII claims, and even if she could, she fails to rebut the Board's nondiscriminatory reasons for those employment decisions.

## B. Gray's Rehabilitation Act and Rehabilitation Act Retaliation Claims Fail

Gray's various theories of liability under the Rehabilitation Act all fail for the same reason—"with respect to the 'underlying health condition' at issue in this litigation, it is undisputed that Ms. Gray did not tell the supervisors at issue about her underlying health conditions."  Docs. 59-1 ¶ 19; 70-1 ¶ 19.  The Rehabilitation Act prohibits covered employers from discriminating against employees based on their disabilities.  29 U.S.C. § 794(a).  To establish a prima facie case of discrimination under the Rehabilitation Act, Gray "must show that (1) [s]he has a disability; (2) [s]he is otherwise qualified for the position; and (3) [s]he was subjected to unlawful discrimination as the result of h[er] disability."  *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1334 (11th Cir. 2022).  Unlawful discrimination includes an employer's failure to provide a reasonable accommodation for an employee's disability, or "an adverse employment action, such as termination," because of an employee's disability.  *Boyle v. City of Pell City*, 866 F.3d 1280, 1289 (11th Cir. 2017).

The Rehabilitation Act also prohibits retaliating against an employee for engaging in protected activity.[9]  29 U.S.C.§ 794(a).  "To demonstrate a prima facie case of

---

[9] "The Rehabilitation Act incorporates the anti-retaliation provision from § 12203(a) of the Americans with Disabilities Act (ADA), 29 U.S.C. §§ 791(g), 793(d), 794(d)."  *Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec.*, 410 F. App'x 243, 245 (11th Cir. 2011) (citing *Sutton v. Lader*, 185 F.3d 1203, 1207 n.5 (11th Cir.1999)).

retaliation under the Rehabilitation Act, a plaintiff must show that: (1) she was engaged in statutorily protected activity under the Rehabilitation Act; (2) she suffered an adverse-employment action; and (3) there is a causal connection between the protected conduct and the adverse-employment action." *Dale v. Wynne*, 497 F. Supp. 2d 1337, 1344 (M.D. Ala. 2007) (citing *Parris v. Miami Herald Publ'g Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000); *Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002)). Here, Gray only argues she engaged in protected activity "when she requested a reasonable accommodation in May 2020." Doc. 70 at 9.

The threshold issue, then, is whether Gray provided GMC with enough information about her "disability" to trigger protections under the Rehabilitation Act. *See Owens*, 52 F.4th at 1334-35. While Gray's amended complaint alleged she had "heart disease," it is undisputed that Gray only told her supervisors that she desired accommodations due to "underlying health conditions," which, in Gray's view, made her especially susceptible to the coronavirus.[10] Docs. 59-1 ¶¶ 19-20; 70-1 ¶¶ 19-20. While it is true that "the link between the disability and the requested accommodation may often be obvious," for example, an "employee confined to a wheelchair … would hardly need a doctor's report to show that she needed help in getting to her workstation if this were accessible only by climbing a steep staircase," that is not this case. *Owens*, 52 F.4th at 1335-36. Rather, Gray merely requested GMC install plexiglass barriers,

---

[10] Gray's factual summary is a cut and paste from her response to the Board's motion for partial judgment on the pleadings. *Compare* Doc. 14 at 1-4 *with* Doc. 70 at 1-4. For example, her summary judgment brief contends "Defendant was aware of the fact that Ms. Gray suffers from heart disease." Doc. 70 at 1 (citing Doc. 8 ¶¶ 12-13). No mention of "heart disease" is made in the Board's statement of facts or Gray's response to the Board's statement of facts—it is only found in Gray's amended complaint. *See* Docs. 59-1; 70-1.

among other things, because she was afraid of catching the coronavirus.  Docs. 59-1 ¶¶ 17-19; 70-1 ¶¶ 17-19.

In short, GMC could not accommodate Gray's disability, or for that matter, terminate Gray because of her disability, because Gray never informed anyone at GMC of the "heart condition," which apparently (though not based on the record) forms the basis of her Rehabilitation Act claims.  *Owens*, 52 F.4th at 1334-35 ("We have held that a plaintiff cannot sustain a prima facie case of disability discrimination without proof that her employer knew of her disability.").  Being afraid of coronavirus in some vague sense is not enough—in May 2020 nearly everyone was concerned about the pandemic, which is presumably why GMC provided its employees with masks and hand sanitizer before they returned to the office.  *See* Docs. 59-1 ¶ 17; 70-1 ¶ 17.  And because Gray's vague request for accommodations due to "underlying health conditions" does not constitute protected activity under the Rehabilitation Act, her retaliation claim also fails.  *Dale*, 497 F. Supp. 2d at 1344; *see Owens*, 52 F.4th at 1334 ("[A]n employee must identify her disability before an employer is obligated to engage in an interactive process about accommodating that disability.").  Finally, even if Gray had engaged in some form of protected activity, her Rehabilitation Act retaliation claim still fails because Gray cannot show that the Board's RIF was pretextual.

**IV. CONCLUSION**

For the reasons noted, the Board's motion for summary judgment (Doc. 59) is

**GRANTED**.

**SO ORDERED**, this 13th day of September, 2023.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT